IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HALSTED STREET DELI HOLDINGS, LLC<br><br>*Plaintiff,*<br><br>v.<br><br>ERIE INDEMNITY COMPANY and ERIE INSURANCE EXCHANGE,<br><br>*Defendants.* | Case No.<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff, Halsted Street Deli Holdings, LLC ("Halsted Street"), by its attorneys, Tarpey Wix LLC, for its complaint against Defendants, Erie Indemnity Company ("Erie Indemnity") and Erie Insurance Exchange ("Erie Exchange")(collectively referred to as "Erie"), states the following:

## INTRODUCTION

1. Halsted Street operates deli restaurants at twenty-three (23) separate locations throughout the Chicagoland area, the primary business of which is to serve food and drinks to patrons in person and on premises in the curated atmosphere it has created at each of its physical locations. Halsted Street is the insured on a commercial general liability policy issued by Erie that provides, among other things, business interruption coverage for each of Halsted Street's 23 locations. The policy issued by Erie provides broad, all-risk coverage without any exclusions for damages caused by a pandemic or viruses. Halsted Street's restaurants suffered substantial losses of revenue in connection with the government mandated shutdown of the state of Illinois

in response to the COVID-19 pandemic that affected each of its locations. Halsted Street timely reported its business interruption claim to Erie; however, Erie has wrongfully denied coverage without any investigation or basis. Accordingly, Halsted Street seeks a declaration of insurance coverage under the policy issued by Erie and a judgment of bad faith by Erie.

## PARTIES, JURISDICTION AND VENUE

2. Halsted Street is an Illinois limited liability company with its principal place of business in Lake County, Illinois. The sole member of Halsted Street is James Gondeck, who is an Illinois resident. Halsted Street operates 23 locations in Cook and DuPage counties in Illinois.

3. Erie Indemnity is a publicly held Pennsylvania corporation with its principal place of business in Erie, Pennsylvania. Erie Indemnity is the management company for the Erie Exchange.

4. Erie Exchange is a subscriber-owned Pennsylvania-domiciled reciprocal insurer that writes property and casualty insurance. Erie's property and casualty and life insurance operations are owned by Erie Exchange. Erie Indemnity, Erie Exchange, and its subsidiaries and affiliates operate collectively as the "Erie Insurance Group."

5. This Court has subject matter jurisdiction under 28 U.S.C §1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over Erie pursuant to the Illinois "long arm statute," 735 ILCS 5/2-209, because Erie has submitted to jurisdiction in this state by: (a) transacting business in Illinois; (b) contracting to insure a person, property or risk located within Illinois at the time of contracting; and (c) making a contract substantially connected with Illinois.

See 735 ILCS 5/2-209(1), (4) and (7).  In addition, Erie exercises substantial, systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois and seeking additional business in Illinois.

7. This Court has jurisdiction to grant declaratory relief under 28 U.S.C. §2201 because an actual controversy exists between the parties as to their respective rights and obligations under the insurance policies issued by Erie with respect to loss of business arising from the civil authority event detailed below.

8. Venue is proper in this District pursuant to 28 U.S.C §1391(b)(2) because a substantial part of the events or omissions giving rise to Halsted Street's claims occurred within the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

**A. The Erie Insurance Policies.**

9. In exchange for a substantial premium, Erie issued to Halsted Street a commercial liability policy, Ultrapack Plus Policy, Policy No. Q971973286, Policy Period November 16, 2019 to November 16, 2020 (the "Policy") that provides coverage for all 23 Halsted Street locations.  A copy of the Policy is attached as Exhibit A.

10. In addition, Erie issued to Halsted Street an umbrella policy, Commercial Liability Umbrella, Policy No. Q351670304 (the "Umbrella Policy") that also provides coverage for all 23 Halsted Street locations.  A copy of the Umbrella Policy is attached as Exhibit B.

11. The Policy covers each of Halsted Street's 23 locations from "direct physical "loss" of or damage to Covered Property… caused by or resulting from a peril insured against." Ex. A, Section I – Coverages, Insuring Agreement.

12. The Policy is an "all-risk" policy that provides broad coverage for losses caused by any cause unless specifically excluded.

13. "Covered Property" includes each of Halsted Street's 23 locations set forth in the Declarations. Ex. A., Section I, Building(s), Coverage 1, A, p. 1.

14. The Policy provides Contingent Business Interruption Coverage, Income Protection Coverage, Extra Expense Coverage and Business Personal Property Coverage for each of Halsted Street's 23 locations.

15. The Policy covers the loss of "income" for Contingent Business Interruption from a partial or total "interruption of business" resulting directly from "loss" or damage to Building(s) or Business Personal Property from a peril insured against. Ex. A., Section VIII (B)(5), p. 21.

16. As defined in Section XI of the Policy, "Loss" means direct and accidental loss or damage to covered property. Ex. A., Section XI, p. 36.

17. As defined in Section XI of the Policy, "Interruption of business" means the period of time that the business is partially or totally suspended and it: 1) Begins with the date of direct "loss" to covered property caused by a peril insured against; and 2) Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality. Ex. A., Section XI, p. 36.

18. As defined in Section XI of the Policy, "Income" means the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interests and rents. Ex. A., Section XI, p. 36.

19. "Income Protection" means loss of "income" sustained due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against.  Ex. A, Section I, Income Protection – Coverage 3, A. – Income Protection Coverage, p. 3.

20. "Extra Expense" means necessary expenses incurred due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against."  Ex. A., Section I, Income Protection – Coverage 3, B. – Extra Expense Coverage, p. 3.

21. The Policy also provides additional coverage for "the actual loss of "income"…you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" provided that…access to the area immediately surrounding the damaged property is prohibited by civil authority" and "the action of civil authority is taken in response to a dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage."  Ex. A., Section I, Additional Coverages, 1. Civil Authority, p. 4.

22. Unlike some commercial property policies available in the market, the Policy does not include an exclusion for a "loss" caused by a pandemic, viruses, infectious diseases, microorganisms or dangerous substances or conditions.  Thus, Halsted Street reasonably expected that the Policy included coverage for physical loss and business interruption losses caused by COVID-19 and civil authority shutdowns as a result of COVID-19.

23. If Erie had wanted to exclude pandemic-related losses under the Policy, it easily could have done so with an express exclusion.  It did not.

24.     The Umbrella Policy provides coverage for losses covered by the Policy when the limits of the underlying Policy have been exhausted.  The Umbrella Policy does not include an exclusion for a loss caused by a pandemic, viruses, infectious diseases, microorganisms or dangerous substances or conditions.

25.     The interruption of Halsted Street's business cause by the COVID-19 pandemic and government orders as described below are covered losses under various sections of the Policy.   Illinois courts have consistently held that the presence of a dangerous substance in a property constitutes "physical loss or damage."  *See, e.g., Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E. 2d, 622, 625-26 (Ill. Ct. App. 1999), as modified on denial of reh'g (Dec. 3, 1999).  COVID-19 is a "dangerous substance" that was deemed to be present at each of Halsted Street's 23 locations and caused "physical loss or damage."

**B. The COVID-19 Pandemic.**

26.     According to the Centers for Disease Control and Prevention ("CDC"), the novel coronavirus, SARS-CoV-2, that causes COVID-19 can spread by respiratory droplets when an infected person coughs, sneezes, or talks. A person can become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.

27.     Research led by scientists from the National Institute of Health ("NIH") and National Institute of Allergy and Infectious Diseases ("NIAID") indicated the virus can live on surfaces for several days and in the air for several hours.  Research published in The New England Journal of Medicine ("NEJM") also indicates the virus can survive in the air for several hours.

28.     COVID-19 may be spread when an infected person coughs, sneezes, or talks, particularly when in close contact with other people.  According to the CDC, at the relevant times in question, it was unknown how long the air inside a room occupied by someone with confirmed COVID-19 remains potentially infectious, and facilities need to consider factors such as the size of the room and the ventilation system design (including location of supply and exhaust vents) when deciding how long to close off rooms or areas used by ill persons before beginning disinfection. Taking measures to improve ventilation in an area or room where someone was ill or suspected to be ill with COVID-19 will help shorten the time it takes respiratory droplets to be removed from the air.  According to the CDC, the more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread.

29.     CDC guidance for restaurants and bars states that the risk of COVID-19 spread increases in a restaurant or bar settings with on-site dining. On-site dining where seating capacity is reduced to allow tables to be spaced at least 6 feet apart poses a "high" risk of infection. On-site dining where seating capacity is not reduced and tables are not spaced at least 6 feet apart poses the "highest risk" of infection.

30.     Early studies found that SARS-CoV-2 can survive on surfaces for two or three days, but as epidemiologists watched the pandemic unfold, evidence emerged about the disease spreading in crowded rooms – especially at bars, restaurants and churches – suggesting that airborne virus particles were the main cause of transmission.  The State of Illinois recognizes the propensity of COVID-19 to physically impact surfaces and personal property.

31.     While the FDA Restaurant Guidance contemplates best practices for food preparation and take-out and delivery services, it does not provide guidance on how to prevent the spread of coronavirus when serving customers inside a dining room, bar, or theater, and in

fact includes recommendations like "[d]iscontinu[e] operations, such as salad bars, buffets, and beverage service stations that require customers to use common utensils or dispensers." The CDC has published research finding: "Adults with positive SARS-CoV-2 test results were approximately twice as likely to have reported dining at a restaurant than were those with negative SARS-CoV-2 test results." This research also states: "Reports of exposures in restaurants have been linked to air circulation. Direction, ventilation, and intensity of airflow might affect virus transmission, even if social distancing measures and mask use are implemented according to current guidance. Masks cannot be effectively worn while eating and drinking, whereas shopping and numerous other indoor activities do not preclude mask use."

### C. Civil Authorities Cause a Loss of Business Income by Prohibiting Access to the Insured Properties.

32. Beginning in March 2020, Halsted Street incurred severe losses of business income due to orders by civil authorities, both state and local, that prohibited access to the locations insured under the Policy.

33. On March 15, 2020, Illinois Governor Pritzker issued Executive Order 2020-07, ordering the closing of all restaurants, bars, and movie theaters to the public pursuant to an action of civil authority. Governor Pritzker declared that COVID-19 constituted a public health emergency and a disaster pursuant to the provisions of the Illinois Emergency Management Agency Act.

34. Executive Order 2020-07 required that bars and restaurants in Illinois "must suspend service for and may not permit on-premises consumption," and prohibited the public from accessing Halsted Street's deli restaurants, prohibiting Halsted Street from using its properties to host customers and triggering coverage under the Policy. Executive Order 2020-07 specifically states, "the Illinois Department of Public Health recommends Illinois residents avoid

8

group dining in public settings, such as in bars and restaurants, which usually involves prolonged close social contact contrary to recommended practice for social distancing," and that "frequently used surfaces in public settings, including bars and restaurants, if not cleaned and disinfected frequently and properly, also pose a risk of exposure."

35. Executive Order 2020-07 required Halsted Street to physically close and suspend normal operations at all 23 of its locations on March 16, 2020. Executive Order 2020-07 applied to "all businesses in the State of Illinois that offer food or beverages for on-premises consumption, including restaurants, bars, grocery stores, and food halls," and prohibited customers from entering the premises of these businesses other than for carry-out and then immediately leave upon receiving the food. As a result of the order, Halsted Street properties covered by the Policy could not physically host customers.

36. On March 20, 2020, Governor Pritzker issued Executive Order 2020-10, closing all "non-essential" businesses in Illinois, including all restaurants and movie theaters. Halsted Street's operations do not qualify as essential businesses. Executive Order 2020-10 prohibited "all public and private gatherings of any number of people occurring outside a single household or living unit," and closed to the public "all places of public amusement, whether indoors or outdoors."

37. Executive Order 2020-10 likewise was made in response to the continued and increasing presence of the coronavirus on property or around Halsted Street's premises, and extended the requirement that bars and restaurants in Illinois "must suspend service for and may not permit on-premises consumption" through April 7, 2020.

38. On April 1, 2020, Governor Pritzker issued Executive Order 2020-18 in response to the continued and increasing presence of the coronavirus on property or around Halsted

Street's premises and extended the requirement that bars and restaurants in Illinois "must suspend service for and may not permit on-premises consumption" through April 30, 2020.

39. On April 30, 2020, Governor Pritzker issued Executive Order 2020-32 in response to the continued and increasing presence of the coronavirus on property or around Plaintiff's premises and extended the prohibition of on-premises consumption through May 30, 2020.

40. Like the March 15, 2020 Executive Order, the March 20, 2020, April 1, 2020, and April 30, 2020 Executive Orders prohibited the public from accessing Halsted Street's restaurants, thereby causing the necessary suspension of their operations and triggering coverage under the Policy.

41. Under the Illinois "Restore Illinois" reopening plan, in Phases 1-3, access to bars and restaurants is limited to delivery, pickup and drive-through only. In Phase 4, bars and restaurants were permitted to open but with capacity limits. Illinois did not enter Phase 4 until June 26, 2020, and thereafter continued to limit access and restricted indoor dining to groups of 10 or less, with tables spaced 6-feet apart in seated areas and with standing areas at no more than 25% of capacity.

42. On October 29, 2020, Governor Pritzker issued Executive Order 2020-64 prohibiting all bars and restaurants in Cook and DuPage counties from hosting patrons indoors. That order remains in effect as of filing this complaint.

43. As a result of Governor Pritzker's use of civil authority, Halsted Street has been forced to suspend and/or limit ordinary operations because it could not host customers at any of its locations covered by the Policy, resulting in substantial lost income. These conditions have

continued throughout the Policy Period and have resulted in a loss in use of Halsted Street's locations, loss of income and incurred extra expense.

### D. Erie Wrongfully Denies Coverage.

44. On or around April 10, 2020, Halsted Street timely provided Erie with notice of a claim seeking coverage under the Policy for losses caused by COVID-19 and the civil authority shutdowns as described herein at each of its locations.

45. On or around April 17, 2020, Erie, without conducting any meaningful claim investigation as required, issued a blanket denial of coverage for all 23 of Halsted Street's locations. Erie based the denial of coverage on provisions and language that were not contained in the Policy. After Halsted Street pointed out the error, Erie rescinded all the denial letters for each location.

46. On or around May 14, 2020, Erie, again without conducting any meaningful claim investigation as required, issued another blanket denial of coverage for all 23 of Halsted Street's locations. Copies of the May 14, 2020 denial letters are attached as Exhibit C.

47. Erie wrongfully denied business interruption coverage to Halsted Street based on its determination that there was no partial or total "interruption of business" due to direct physical "loss" or damage to Covered Property on the premises from a peril insured against. Ex. C.

48. Erie wrongfully denied Civil Authority coverage based on its determination that a Civil Authority did not order that the busines be closed due to damage to property within one mile of the premises described in the "Declarations," caused by a peril insured against. Ex. C.

49. Erie wrongfully denied Contingent Business Interruption based on its determination that there was no partial or total "interruption of business" directly from "loss" or

damage to Buildings or Business Personal Property of "dependent properties" from a peril insured against.  Ex. C.

50. In addition, Erie wrongfully denied income protection coverage based on exclusions that are inapplicable to Halsted Street's claim for coverage.  Ex. C.

## COUNT I
## DECLARATORY JUDGMENT

51. Paragraphs 1 through 50 are incorporated as if fully restated here.

52. The Policy is an insurance contract under which Erie was paid premiums in exchange for its promise to pay Halsted Street losses for claims covered by the Policy, such as business losses incurred as a result of the government orders forcing it to close and/or significantly limiting the operations at each of its locations due to COVID-19.

53. The government orders prohibiting customers from entering the covered premises are "actions by a civil authority" resulting in a "loss" and an "interruption of business" that are covered by the Policy.

54. Halsted Street has complied with all applicable provisions of the Policy, including payment of the premiums in exchange for coverage under the Policy.

55. Erie has arbitrarily and without justification refused to reimburse Halsted Street for losses incurred by the Halsted Street locations in connection with the covered business losses related to the interruption of its business.

56. An actual case or controversy exists regarding Halsted Street's rights and Erie's obligations under the Policy to reimburse Halsted Street for the full amount of loss of "income" and "extra expense" incurred by Halsted Street in connection with the Executive Orders and the interruption of business at each of its locations stemming from the COVID-19 pandemic.

WHEREFORE, pursuant to 28 U.S.C. §2201, Halsted Street seeks a declaratory judgment from this Court declaring the following: (a) Halsted Street's losses incurred in connection with the novel coronavirus, the Executive Orders and the necessary interruption of its business at each of its locations stemming from the COVID-19 pandemic are insured losses under the Policy; (b) Erie has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Halsted Street's losses by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and (c) Erie is obligated to pay Halsted Street for the full amount of the losses incurred and to be incurred in connection with the covered business losses.

## COUNT II
## BREACH OF CONTRACT

57. Paragraphs 1 through 50 are incorporated as if fully restated here.

58. Each Policy is an insurance contract under which Erie was paid premiums in exchange for its promise to pay Halsted Street's losses for claims covered by the Policy, such as business losses incurred as a result of the government orders forcing it to close and/or limit its businesses.

59. Halsted Street has complied with all applicable provisions of the Policy, including payment of the premiums in exchange for coverage under the Policy, and yet Erie has abrogated its insurance coverage obligations pursuant to the Policy' clear and unambiguous terms.

60. By denying coverage for any business losses incurred by Halsted Street in connection with the government orders, Erie has breached its coverage obligations under the Policy.

61. As a result of Erie's breaches of the Policy as well as the Umbrella Policy, Halsted Street has sustained substantial damages in excess of $2,000,000 for which Erie is liable, in an amount to be established at trial.

WHEREFORE, Halsted Street respectfully requests a judgment in its favor in an amount to be determined at trial, its costs of suit and reasonable attorneys' fees, and any additional relief the Court deems fair and just.

## COUNT III
## BAD FAITH DENIAL OF INSURANCE UNDER 215 ILCS 5/155

62. Paragraphs 1 through 50 are incorporated as if fully restated here.

63. Upon receipt of Halsted Street's claims, Erie immediately denied the claims without conducting any investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law. See 215 ILCS 5/154.6.

64. Erie's denials were vexatious and unreasonable.

65. Erie's denials constitute "improper claims practices" under Illinois law—namely Erie's (1) refusals to pay Halsted Street's claims without conducting reasonable investigations based on all available information and (2) failure to provide reasonable and accurate explanations of the bases in its denials. See 215 ILCS 5/154.6 (h), (n).

66. Therefore, pursuant to 215 ILCS 5/155, Halsted Street requests that, in addition to entering a judgment in favor of Halsted Street and against Erie for the amount owed under the Policy at the time of judgment, the Court enter a judgment in favor of Halsted Street and against Erie for an amount equal to the greater of 60% of the amount which the trier of fact finds that Halsted Street is entitled to recover under the Policy, exclusive of costs; and other penalties and costs as provided by law. See 215 ILCS 5/155.

67. Halsted Street further requests that the Court enter a judgment in favor of Halsted Street and against Erie in an amount equal to the attorneys' fees and costs incurred by Halsted Street for the prosecution of this coverage action against Erie, which amount will be proved at or after trial, pursuant to 215 ILCS 5/155.

WHEREFORE, Halsted Street respectfully requests a judgment in its favor in an amount to be determined at trial, penalties as provided by the Illinois Insurance Code, its costs of suit and reasonable attorneys' fees, and any additional relief the Court deems fair and just.

Date: December 29, 2020

Respectfully submitted,
HALSTED STREET DELI HOLDINGS, LLC

By: /s/ David G. Wix
One of its attorneys

Daniel W. Tarpey (dtarpey@tarpeywix.com)
David G. Wix (dwix@tarpeywix.com)
Matthew M. Showel (mshowel@tarpeywix.com)
TARPEY WIX LLC
225 W. Wacker Drive, Ste. 1515
Chicago, IL 60606
(312) 948-9090